United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT VALENTINO HERNANDEZ, Plaintiff, v. DAVE DAVEY, et al., Defendants. | Case No. 15-cv-01805-HSG<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY**<br><br>Re: Dkt. No. 1 |

Petitioner Robert Valentino Hernandez seeks federal habeas relief under 28 U.S.C. § 2254 from his state court conviction. For the reasons set forth below, the petition is DENIED.

**I.  BACKGROUND**

**A.  Factual Background**

The following factual background is taken from the November 13, 2013 opinion of the California Court of Appeal:[1]

> On February 13, 2007, at approximately 11:00 p.m., a woman and her 14–week–old fetus were killed when approximately 30 shots were fired into her home during a drive-by shooting. No witness testified to seeing defendant fire the shots, but several witnesses provided circumstantial evidence tying him to the shooting.
> Perhaps the strongest evidence connecting defendant to the killings were incriminating statements made by him to Jason Treas. Treas had known defendant and his parents since defendant was born and saw his relationship with the family as that of a relative. Both Treas and defendant were members of the Norteño gang at the time of the shooting. However, Treas was at the top of the gang's chain of command, while defendant was a younger member engaged in smaller local drug sales. Both were in the Martinez Detention Facility in January 2009, Treas for a probation violation and

---

[1] The Court has independently reviewed the record as required by AEDPA. *Nasby v. Daniel*, 853 F.3d 1049, 1052–54 (9th Cir. 2017). Based on the Court's independent review, the Court finds that it can reasonably conclude that the state court's summary of facts is supported by the record and that this summary is therefore entitled to a presumption of correctness, *Taylor v. Maddox*, 366 F.3d 992, 999–1000 (9th Cir. 2014), unless otherwise indicated in this order.

defendant awaiting trial in connection with the present offense. The two requested to be roommates and were moved into the same cell on January 27, 2009.

Treas testified that gang members were required to share each other's "paperwork," all papers relevant to their custody, upon arriving in a new cell as a clearance process. Treas reviewed defendant's paperwork within two to three days of their becoming cellmates. As part of this process, defendant brought up the details of the shooting. Defendant explained to Treas he shot at the house because he believed one of the occupants was a rival gang member.

At the time he was placed in the cell with defendant, Treas had already begun discussing cooperation with law enforcement officials. Treas first discussed providing information regarding criminal activity in Contra Costa County after he was arrested in September 2008 by San Pablo Police Officer Jeff Palmieri. After Treas was sentenced but before surrendering himself to the Martinez Detention Facility, Palmieri contacted him and they discussed whether Treas was tired of living a life of dealing drugs and wanted a way out. To prove Treas was a truthful source of useful information, Palmieri asked Treas if he could "give [him] a couple things [he] could ... look into or a couple arrests." In response, Treas voluntarily showed him some houses where criminal activity was occurring, but he was not willing to commit to any future arrangement. Palmieri suggested a point system where Treas would divulge information in order to gain his trust, but Treas told him he was not sure he could do that. He did not talk to Palmieri again until he was in custody.

After surrendering himself to the jail on January 9, 2009, Treas met with FBI Special Agent Gregory Eckhart and Palmieri. Treas contacted Palmieri in mid-January before meeting with Eckhart and provided significant, specific information about crimes occurring in San Pablo. Treas testified, "[T]here was so much information that I had, they had to cut me short.... [T]he breadth of the information on the organized crime activity I was involved in was such that there was no conversation about particular cases at all." Palmieri made no promises to Treas for volunteering information and Treas did not ask for anything in return.

Treas described his relationship with law enforcement at this point as "more of a confession," and said he was just seeking "personal salvation," but did not feel under any pressure to cooperate as he was happy with the deal he took and had already been sentenced prior to contacting Palmieri. According to Treas, this was just the first time he had an opportunity to come clean with law enforcement and it was a "very spiritual experience" for him. Recognizing what he knew was "beyond the resources" of local law enforcement, Treas encouraged Palmieri to contact the FBI and advise them he was willing to cooperate.

Eckhart first met with Treas on January 21, 2009, before Treas and defendant became cellmates, and sought his cooperation in providing information. In an effort to get more information than Treas had already volunteered, Eckhart told Treas if he did not cooperate Eckhart would "pursue charges against him for a methamphetamine case." Treas testified he was not threatened because Eckhart told him about the possibility of his indictment in an advisory manner. He also testified he was anticipating a federal indictment, but, of course, expressed to Eckhart he did not want to

2

> be indicted. Treas got upset with Eckhart's aggressive approach and explained to Eckhart he was coming forward with information and was not looking for anything other than "some light at the end of this tunnel," which Treas testified meant "salvation." He did not agree to be more forthcoming in the future in response to Eckhart's probing nor offer his services to avoid indictment at this time. Defendant's case was not mentioned at this meeting, and because of Treas's negative reaction Eckhart did not think he would ever speak to him again. This was the extent of Treas' discussions with law enforcement at the time of his conversations with defendant.
>
> No law enforcement officer had knowledge of or inquired into defendant's case until Treas came forward with information in February seeking an immunity agreement for his drug involvement. In February, Treas also expressed concerns to Palmieri about early release from the facility for safety reasons. However, it was not until March 23, 2009, following his early release upon law enforcement's recommendation, that Treas reached an agreement and provided details of defendant's involvement in the shooting for the first time. Treas agreed to participate in controlled buys of narcotics and firearms with the Norteño gang, provide information to law enforcement, and testify if necessary. Eckhart told Treas he could not promise him anything, but if he remained truthful, there was a possibility of certain benefits, such as relocation, witness security, and recommendation against indictment. Treas was ultimately not indicted and upon testifying against the Norteño gang, he received approximately $30,000 for living expenses associated with relocating for his protection.
>
> Defendant unsuccessfully moved to exclude Treas's testimony, but the trial court found the evidence admissible because Treas had no agreement with law enforcement prior to the time defendant discussed the crime with Treas. On April 29, 2011, a jury found defendant guilty, and defendant was sentenced to two consecutive 15–years–to–life terms.

*People v. Hernandez*, No. A132652, 2013 WL 6003337, at *1–3 (Cal. Ct. App. Nov. 13, 2013) (footnote omitted).

## B. Procedural History

After the California Court of Appeal affirmed his conviction, Petitioner filed a petition for review with the California Supreme Court. Dkt. No. 1 at p-1. The California Supreme Court denied review, and this federal habeas petition followed on April 21, 2015. *Id.*

## II. LEGAL STANDARD

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This Court may entertain a petition for a writ of habeas corpus on "behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.

3

§ 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Id.* at 405–06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

The state court decision to which § 2254(d) applies is the "last reasoned decision" of the

4

state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005). The California Court of Appeal was the last reasoned state court decision that addressed the claims raised by Petitioner. Accordingly, in reviewing the habeas petition, this Court reviews the California Court of Appeal's decision. *See Ylst*, 501 U.S. at 803–04; *Barker*, 423 F.3d at 1091–92.[2]

## III. ANALYSIS

### A. The Court of Appeal Reasonably Found No *Massiah* Violation.

On appeal, Petitioner argued that the government violated the rule set out in *Massiah v. United States*, 377 U.S. 201 (1964), in connection with his conversations with Treas. The Court of Appeal rejected this claim as follows:

> In *Massiah, supra,* 377 U.S. 201, the United States Supreme Court held that once an adversarial criminal proceeding has been initiated against the accused, and the constitutional right to the assistance of counsel has attached, any incriminating statement the government deliberately elicits from the accused in the absence of counsel is inadmissible at trial against the defendant. [Citations.] In order to prevail on a *Massiah* claim involving use of a government informant, the defendant must demonstrate that both the government and the informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks. [Citation.] Specifically, the evidence must establish that the informant (1) was acting as a government agent, i.e., under the direction of the government pursuant to a preexisting arrangement, with the expectation of some resulting benefit or advantage, and (2) deliberately elicited incriminating statements. [Citations.]
> Where the informant is a jailhouse inmate, the first prong of the foregoing test is not met where law enforcement officials merely accept information elicited by the informant-inmate on his or her own initiative, with no official promises, encouragement, or guidance. [Citation.] In order for there to be a preexisting arrangement, however, it need not be explicit or formal, but may be 'inferred from evidence that the parties behaved as though there were an agreement between them, following a particular course of conduct' over a period of time. [Citation.] Circumstances probative

---

[2] Although *Ylst* was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default. *Barker*, 423 F.3d at 1092 n.3 (citing *Lambert v. Blodgett*, 393 F.3d 943, 970 n.17 (9th Cir. 2004), and *Bailey v. Rae*, 339 F.3d 1107, 1112–13 (9th Cir. 2003)). The look through rule is applicable here as the Ninth Circuit has held that "it is a common practice of the federal courts to examine the last reasoned state decision to determine whether a state-court decision is 'contrary to' or 'an unreasonable application of' clearly established federal law" and "it [is] unlikely that the Supreme Court intended to disrupt this practice without making its intention clear." *Cannedy v. Adams*, 706 F.3d 1148, 1158 (9th Cir.), *amended*, 733 F.3d 794 (9th Cir. 2013).

of an agency relationship include the government's having directed the informant to focus upon a specific person, such as a cellmate, or having instructed the informant as to the specific type of information sought by the government." (*In re Neely* (1993) 6 Cal.4th 901, 915.)

In *Randolph v. California* (9th Cir.2004) 380 F.3d 1133 (*Randolph*), the informant sent a letter to law enforcement requesting leniency and indicating he was a cellmate of the defendant. (*Id.* at p. 1139.) Understanding this to be an offer to testify, law enforcement met with the informant several times to discuss his possible testimony, as well as a plea deal relating to the crime for which he was being held. (*Ibid.*) The informant was returned to his cell with the defendant after his initial meeting with law enforcement.[3] (*Randolph,* at p. 1144.) Despite being told not to expect a deal, he received a sentence of probation instead of a prison term upon testifying. (*Ibid.*) In finding the informant to be a government agent, the court recognized agreed-upon compensation is often relevant, but held it is the relationship between the informant and the state that is central and determinative. (*Ibid.*) Under the circumstances, an explicit agreement to compensate the informant was not necessary because the state made a conscious decision to obtain the informant's cooperation and the informant consciously decided to provide that cooperation. (*Ibid.*) The informant obtained information because he wanted leniency, and law enforcement knew or should have known this. (*Ibid.*) On the other hand, the court held any statements obtained before the informant met with and indicated his willingness to cooperate with the prosecution team could not be the basis of a *Massiah* violation. (*Randolph,* at p. 1144.)

The trial court's determination Treas was not acting as a government agent at the time defendant gave his incriminating statements is a factual determination. If supported by substantial evidence it is binding on appeal. (Cf. *People v. Mickey* (1991) 54 Cal.3d 612, 649.) We find such substantial evidence to support the trial court's finding the evidence was admissible.

At the time the incriminating statements were made, Treas had no express preexisting arrangement with law enforcement creating an expectation of benefit or advantage. Rather, the information was obtained on Treas's own initiative, with no official promises, encouragement or guidance. Palmieri and Eckhart both testified there was no agreement in place until mid-March. Neither law enforcement officer knew of defendant's case at the time the incriminating statements were made, nor did they ask Treas to seek out information regarding the shooting. Treas and defendant both requested to be placed in a cell together without encouragement from or the knowledge of law enforcement.

Palmieri's interactions with Treas prior to Treas's discussions with defendant did not establish an explicit arrangement. Palmieri did ask Treas whether he wanted a way out of his life of dealing drugs, and suggested a point system in order for Treas to gain his trust. There was, however, no promise or even discussion of monetary compensation or leniency in exchange for cooperation, Treas was never directed to get information from or about defendant, and he did not agree to provide Palmieri with any information whatsoever going forward. When Treas later initiated contact with Palmieri he spontaneously divulged significant amounts of information without requesting anything in return. He provided

6

law enforcement with information he already knew, but testified he did not feel pressure to cooperate as he had already been sentenced.

At the conclusion of the January 21, 2009 meeting, Treas's first and only meeting with Eckhart before obtaining the incriminating statements, an explicit agreement had not been reached between Treas and Eckhart. During this meeting Eckhart, hoping to elicit more information, told Treas he would pursue a methamphetamine case if he did not fully cooperate. Treas became unhappy with the nature of his relationship with Eckhart, and did not agree to be more forthcoming in the future. Eckhart testified he believed he might never speak to Treas again because of his negative reaction. At this time, Eckhart had not offered Treas any promises in exchange for information, and Treas had not requested anything from Eckhart.

Moreover, no implicit arrangement existed at the time the incriminating statements were made because there was no evidence the parties behaved as though there was an agreement between them, following a particular course of conduct over a period of time. Law enforcement did not direct Treas in any capacity. He was not told to focus upon a specific person or a specific type of information. Treas's discussions with defendant did not occur because he was seeking out information to report to law enforcement, but because of their gang affiliation requiring them to share paperwork. Also, there was no evidence Treas sought out or obtained information from any other inmate.

Defendant suggests Treas had a change of heart once he spent some time in custody and was no longer content with his sentence, which is why he reached out to Palmieri once in custody. Treas did not, however, bring up the possibility of early release due to concerns for his safety, or request any assistance from law enforcement until February. Defendant further argues the monetary benefits and recommendation against indictment, all of which Treas eventually received, cannot be ignored. Nonetheless, each of these benefits was the result of agreements made after the incriminating statements had been made to Treas. While Treas expressed to Eckhart he, of course, did not want to be indicted, no agreement was made to avoid indictment at the January 21 meeting.

Defendant relies heavily on *Randolph,* arguing despite the absence of an explicit agreement for compensation or promises of lenient treatment, Treas's interactions with law enforcement were sufficient to establish he obtained the defendant's statements on behalf of the government. The *Randolph* court focused on the timeline of events and made clear only the incriminating statements the informant elicited after cooperating with law enforcement were inadmissible as Sixth Amendment violations. It was under the specific circumstances of *Randolph,* where it was evident the informant was motivated by his hope for a benefit, law enforcement had discussed a plea deal with him, he had agreed to continue cooperating by testifying against the defendant, and was subsequently placed back in the cell with the defendant that the court reasoned an agency relationship was established without an explicit compensation agreement.

Treas did not agree to cooperate with law enforcement until after defendant revealed his involvement in the shooting. Neither law enforcement officer nor Treas believed Treas to be cooperating with law enforcement at the time the statements were made. Though Treas had provided law enforcement with information unrelated to

7

> the defendant's case, it was not clear he was motivated by hope of gaining a benefit and he did not agree to continue assisting law enforcement in the future. In fact, Treas testified his relationship with law enforcement at the time was more of a confession. This is supported by the fact that he had not requested leniency or any other benefit from law enforcement at the time.

*Hernandez*, 2013 WL 6003337, at *3–5.

The Court of Appeal's holding was not contrary to or an unreasonable application of clearly established law, nor was it based on an unreasonable determination of the facts. Once a defendant is in custody and his Sixth Amendment right to counsel has attached, the government is forbidden from deliberately eliciting incriminating statements from the defendant. *Randolph v. California*, 380 F.3d 1133, 1143 (9th Cir. 2004) (citing *Massiah*, 377 U.S. at 206. This prohibition extends to the use of jailhouse informants who relay incriminating statements from a prisoner to the government. *Id.* However, a *Massiah* violation occurs only if the evidence establishes that the informant (1) was acting as a government agent, and (2) deliberately elicited the incriminating statements. *See id.* at 1144. "[T]he Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached." *Id.* (quoting *Maine v. Moulton*, 474 U.S. 159, 176 (1985)).

### i. Government agent

In order for a *Massiah* violation to have occurred, Treas must have been acting on behalf of the state when Petitioner made incriminating statements. The trial court found there was no such arrangement, noting that "there [was] no evidence of a working relationship" between the Government and Treas at the time the incriminating statements were made. Reporter's Transcript Vol. 2 at 303–306. The Court of Appeal affirmed on the same basis. *Hernandez*, 2013 WL 6003337, at *5.

Petitioner claims that, although there were no explicit promises that Treas would receive lenient treatment in exchange for information, the parties had an implicit agreement based on their ongoing conversations. Pet. at m-4–m-5. According to Petitioner, an implicit agreement can be inferred in this case because "the likely result of [Palmieri and Eckhart's] advisements that Treas would have to earn their trust through a point system would have been that Treas would generate . . . information for [Palmieri and Eckhart] in the hopes of satisfying them." *Id.* at m-4.

8

The Court of Appeal concluded that the record established that Petitioner made the incriminating statements to Treas before Treas had a clear agreement with law enforcement. *Hernandez*, 2013 WL 6003337, at *4. That conclusion was not unreasonable. Treas testified that before he reported to the Martinez Detention Facility on January 9, 2009, Palmieri suggested engaging in a point system wherein Treas would divulge information to gain his trust. Reporter's Transcript Vol. 2 at 173–175. However, Treas testified that he was unconcerned with gaining Palmieri's trust, and felt that he was simply "confiding in" Palmieri. *Id* at 176–177. Treas described the information he provided as a chance to clear his conscience, and "more of confession." *Id.* at 150, 165. He said did not feel pressured to cooperate any further because he had already been sentenced. *Id.* at 175. Palmieri testified, consistent with Treas's account, that he made no promises or agreement regarding Treas's assistance, and Treas did not ask for any, during their conversations between December 7, 2008 and February 5, 2009. *Id.* at 246-248, 263-64.

It also was not unreasonable to conclude that the January 21 meeting, the last meeting between Treas and the government before Petitioner made his incriminating statements, did not establish an agreement between the parties. Treas and Eckhart testified that at that meeting, Eckhart threatened him with an indictment if he did not cooperate. *Id.* at 178–179 (Treas testimony); 213 (Eckhart testimony). Treas said he became upset with the threat, and did not agree to be more forthcoming with Eckhart in the future because he still saw his confessions as an opportunity for "salvation" and not a part of any quid pro quo relationship. *Id.* at 177–180. Eckhart likewise testified that no cooperation agreement with Treas was reached before "mid March, late March." *Id*. at 222–223, 238.

Substantial evidence supports the conclusion that Treas did not agree to cooperate with law enforcement until after Petitioner revealed his involvement in the shooting. The trial court found that Petitioner's statements to Treas between January 27th and January 30th "predate[d] the first meeting where you could even conceivably put any understanding that [Treas and the government] may have reached." *Id.* at 304–306. Based on the record in the state court proceedings, the Court concludes that the Court of Appeal's decision affirming that finding was not based on an unreasonable determination of the facts. Nor was it contrary to, or an unreasonable application of,

9

clearly established Federal law.

### ii. Deliberate elicitation

Moreover, even had there been a relationship with law enforcement at the time Petitioner discussed the February 13 shooting with Treas, the Court of Appeal was not unreasonable in concluding that Treas did not elicit the incriminating statements from Petitioner. The trial court found that Treas was merely a passive listener, which "would not violate . . . *Massiah*, even if there were a relationship [with law enforcement]." *Id.* at 304. The Court of Appeal affirmed on this basis, as well: "Treas's discussions with defendant did not occur because he was seeking out information to report to law enforcement, but because of their gang affiliation requiring them to share paperwork." *Hernandez*, 2013 WL 60033307, at *4. Petitioner argues that he was forced to reveal information about the crime to Treas. Pet. at m-4 ("Petitioner would not merely have been 'stimulated' but practically ordered to tell Treas, the ranking gang member, all of the details of the shooting."). This dynamic was confirmed by Treas's testimony that all Norteño gang members were required to share their papers with each other when rooming together, as the Court of Appeal found. *Hernandez*, 2013 WL 60033307, at *4; *see also* Reporter's Transcript Vol. 2 at 187–188. It was not unreasonable for the Court of Appeal to find that this gang mandate supported the trial court's reasoning that Treas obtained the information from Petitioner as a result of his gang affiliation, rather than through his own deliberate solicitation. *Hernandez*, 2013 WL 60033307, at *4. Based on the record in the state court proceedings, the Court thus concludes that the Court of Appeal's finding was not based on an unreasonable determination of the facts. Nor was it contrary to, or an unreasonable application of, clearly established Federal law.

### B. Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard, *id.* at § 2253(c)(3). "Where a district

court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, Petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## IV. CONCLUSION

Petitioner's claim for habeas relief is DENIED, and the Court declines to issue a certificate of appealability. The Clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

Dated: 8/30/2018

HAYWOOD S. GILLIAM, JR.
United States District Judge

11